IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION


JAMES D. BIRD, JR.                                                PLAINTIFF


        v.                            CIVIL NO. 08-5139


MICHAEL J. ASTRUE, Commissioner
Social Security Administration                        DEFENDANT


### MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION

        Plaintiff James D. Bird, Jr., brings this action pursuant to 42 U.S.C. § 405(g), seeking

judicial review of a decision of the Commissioner of the Social Security Administration

(Commissioner) denying his claims for period of disability and disability insurance benefits

(DIB) and supplemental security income (SSI) benefits under the provisions of Title II and XVI

of the Social Security Act (Act).  In this judicial review, the court must determine whether there

is substantial evidence in the administrative record to support the Commissioner's decision. *See*

42 U.S.C. § 405(g).

### I.      Procedural Background:

        Plaintiff protectively filed his current applications for DIB and SSI on January 25, 2005,

alleging an inability to work since January 14, 2005, due to chronic deep vein thrombosis

(DVT), chronic severe back pain, anxiety and panic attacks, pain in his legs, a sleep disorder,

sleep apnea, short-term memory impairment, acid reflux, chest pain, and chronic fatigue.  (Tr.

65-66, 450-453).  An administrative hearing was held on September 18, 2006, at which plaintiff

appeared with counsel and testified. (Tr. 456-496).

By written decision dated November 30, 2006, the ALJ found that during the relevant time period plaintiff had an impairment or combination of impairments that were severe. (Tr. 15). The ALJ determined plaintiff's severe impairments were as follows: chronic left olecranitis bursitis, tendonitis, status post reflux repair right lower extremity and history of deep vein thrombosis, history of aortic heart valve replacement with continuing Coumadin therapy, diabetes, gastroesophageal reflux disease, depression and anxiety. (Tr. 15). However, after reviewing all of the evidence presented, she determined that plaintiff's impairments did not meet or equal the level of severity of any impairment listed in the Listing of Impairments found in Appendix I, Subpart P, Regulation No. 4. (Tr. 16). The ALJ found plaintiff retained the residual functional capacity (RFC) to lift and carry twenty pounds occasionally, ten pounds frequently; to stand or walk for six of eight hours in a work day; to sit for six of eight hours in a work day; and to occasionally perform overhead reaching with his right dominant upper extremity. Due to pain in his feet and ankles, the ALJ found cannot climb ladders, ropes and scaffolds; and cannot be exposed to extremes in heat, cold or concentrated wetness. Because of anxiety, sleeplessness and pain, the ALJ limited plaintiff to non-complex work with simple instructions, using little judgment and learned by rote with few variables. (Tr. 17). With the help of a vocational expert, the ALJ determined plaintiff could perform his past relevant work as a restaurant host. (Tr. 18).

Plaintiff then requested a review of the hearing decision by the Appeals Council, which denied that request on April 10, 2008. (Tr. 3-5). Subsequently, plaintiff filed this action. (Doc. 1). Both parties have filed appeal briefs, and the case is before the undersigned for report and recommendation. (Doc. 10, 11).

II.   **Evidence Presented:**

At the administrative hearing on September 18, 2006, plaintiff testified he was forty-six years of age and obtained a high school education.  (Tr. 461- 462).  When asked how he spends his day, plaintiff testified he was currently university student and studied constantly. (Tr. 484). Plaintiff reported he was studying to become a counselor and that he received a grant from Arkansas Rehabilitation Services to pay for his education.  Plaintiff testified that through the center for students with disabilities he qualifies for help due to his ADHD and anxiety.  (Tr. 485).  Plaintiff testified he is given twice the test time in a private room as well as note takers and tutors.  Plaintiff testified he has classes five days per week and that he had a 3.7 grade point average.  (Tr. 487).  Plaintiff testified he has a handicapped sticker for his car.  (Tr. 488).  The record reflects plaintiff's past relevant work consists of work as a travel agent, a retails sales person and a restaurant host. (Tr. 470-473).

The medical evidence dated prior to plaintiff's alleged onset date reveals plaintiff has sought treatment for aortic stenosis and arotic valve replacement, lower extremity deep vein thrombosis and thrombophlebitis, anxiety, panic attacks, possible low grade bipolar disease, depression, diabetes, colonic polyposis, gastritis-duodenitis, abdominal pain, hematuria, back pain, a fractured finger.  (Tr. 142-208, 229-249, 301-329, 364, 384-391).

The medical evidence during the relevant time period reflects the following.  Progress notes dated February 2, 2005, report plaintiff's complaints of back pain.  (Tr. 228).  Plaintiff reported he had been lifting many cases of beer at work.  Dr. Dan Bell noted plaintiff ached a bit in his legs, but there was no classic sciatic referral.  Dr. Bell noted plaintiff had a little bit of tenderness through his LS muscles, left greater than right.  Dr. Bell found no bony tenderness

AO72A
(Rev. 8/82)

to percussion, negative sciatic notches and straight-leg raise.  Dr. Bell noted plaintiff had a mild scoliotic curve concave to his right.  Plaintiff's reflexes were symmetric and x-rays showed no bony abnormality.  Plaintiff was able to heel and toe walk well.  Dr. Bell opined plaintiff had back strain with no classic worrisome impingement.  Plaintiff was also diagnosed with perianal dermatitis.

On February 3, 2005, plaintiff presented to the Tree of Life Chiropractic and Acupuncture Clinic with complaints of back and leg pain. (Tr. 220-223).  Plaintiff reported he smoked one package of cigarettes a day, drank two cocktails and one cup of decaffeinated coffee.  Plaintiff reported his exercise as moderate activity. Plaintiff's medications consisted of Coumadin, Xanax, Soma and Percocet.  Dr. Jan Marie Quint noted asymmetry of plaintiff's spine.

Treatment notes dated February 7, 2005, report plaintiff experienced pain with lifting, sitting, standing, sleeping, walking, bending, driving, work activities and home activities.  (Tr. 218).  Plaintiff reported his pain was slightly better but reported the following symptoms: stress, headache, stiffness, achiness, throbbing and weakness. Dr. Quint performed supine cervical, prone thoracic and prone lumbar adjustments.

Treatment notes dated February 14, 2005, report plaintiff experienced pain with lifting, sitting, standing, sleeping, walking, bending, driving, work activities and home activities. (Tr. 216).  Plaintiff's pain was slightly and he listed the following symptoms: stress, dizziness, headache, radiating pain, achiness and weakness.   Dr. Quint performed prone thoracic, prone lumbar and prone sacrum adjustments.  Plaintiff also had a soft tissue massage.

-4-

Progress notes dated February 22, 2005, report plaintiff presented with a "peculiar collection of symptoms - back ache, diarrhea, some intermittent chest pain that's nonspecific and seems stress driven." (Tr. 227). Upon examination, Dr. Bell noted plaintiff had markedly tender right paraspinal muscles to palpation and marked pain with motion of the spine on the right. Plaintiff's abdomen was soft, nontender with hyperactive bowel sounds. Plaintiff was diagnosed with LS strain that was clearly musculoskeletal with no radiculopathy suggesting it would be self-limiting; gastroenteritis; and Coumadin therapy that was a bit overdone. Dr. Bell recommended plaintiff skip the Coumadin one day; symptomatic treatment with Phenergan; maintain a light diet with soups and low residue; use Soma with Percocet for severe pain; and continue chiropractic treatment.

Treatment notes dated February 28, 2005, report plaintiff experienced pain with personal care, lifting, sitting, standing, sleeping, walking, bending, driving, work activities and home activities. (Tr. 212). Plaintiff's pain was slightly and he listed the following symptoms: stress, depression, nausea, vomiting, dizziness, blurred vision, headache, radiating pain, stabbing, stiffness, achiness, numbness, throbbing and weakness. Dr. Quint performed supine cervical, prone thoracic, prone lumbar and prone sacrum adjustments. Plaintiff underwent a soft tissue massage.

On March 7, 2005, plaintiff completed a subjective complaint chart. (Tr. 209). He reported experiencing pain with personal care, lifting, sitting, standing, sleeping, walking, bending, driving, work activities and home activities. Plaintiff reported his pain was slightly better. Plaintiff indicated he was experiencing the following symptoms: stress, depression, nausea, dizziness, blurred vision, headache, radiating pain, stabbing, stiff, achey, muscle spasm,

-5-

numbness, throbbing and weakness.  Dr. Quint noted plaintiff underwent an adjustment, soft tissue massage and acupuncture. (Tr. 210). Plaintiff was to continue in two weeks for treatment. (Tr. 211).

Progress notes dated March 11, 2005, report plaintiff was better on all accounts. (Tr. 226).  Plaintiff reported his left leg was feeling better with less pain; and his back was better. Plaintiff reported he felt the best that he had felt in a year.  Dr. Bell noted they talked about plaintiff's anxiety and bipolar tendencies and that plaintiff did not want to try any other medications.  Plaintiff was diagnosed with back strain with sciatica, improving; intermittent abdominal pain that fits irritable bowel syndrome; anxiety disorder, possibly atypical bipolar; and Coumadin therapy.  Dr. Bell recommended leaving all plaintiff's medications the same.

Eureka Springs Hospital emergency room records dated March 12, 2005, report plaintiff sough treatment for a corneal abrasion.  (Tr. 300).

On March 21, 2005, plaintiff completed a subjective complaint chart.  (Tr. 331). He reported experiencing pain with personal care, lifting, sitting, standing, sleeping, walking, bending, driving, work activities and home activities. Plaintiff reported his pain was significantly better.  Plaintiff indicated he was experiencing the following symptoms: stress, depression, dizziness, blurred vision, headache, radiating pain, stabbing, stiffness, achey, throbbing and weakness.  Dr. Quint noted plaintiff underwent adjustments and soft tissue massage. (Tr. 332). Plaintiff was to continue in three weeks for treatment.

On March 23, 2005, Dr. Robert M. Redd, a non-examining, consultative physician, completed an RFC assessment.  (Tr. 272-279).  After reviewing plaintiff's medical records, he concluded that plaintiff could lift and/or carry twenty pounds occasionally and ten pounds

-6-

frequently; stand and/or walk (with normal breaks) for a total of about six hours in an eight-hour workday; sit (with normal breaks) for a total of about six hours in an eight-hour workday; and push and/or pull (including operation of hand and/or foot controls) unlimited, other than as shown for lift and/or carry. (Tr. 273). Dr. Redd opined plaintiff had no postural, manipulative, visual, communicative or environmental limitations. After reviewing the record, this assessment was affirmed by Dr. Kimberly G. Adametz on June 17, 2005. (Tr. 279).

Progress notes dated April 1, 2005, report plaintiff complained of a tongue injury. (Tr. 225). Plaintiff reported the injury occurred the previous night while he was chewing on a french fry. Upon examination, Dr. Bell noted plaintiff had a jagged superficial scathing laceration to the very center of the tongue just left of the midline. Dr. Bell noted plaintiff was very intoxicated and quite ridiculous though funny. Plaintiff admitted to drinking some champagne. Dr. Bell noted he refused to let plaintiff leave and his nurse called plaintiff's girlfriend. However, plaintiff suddenly left and drove himself so Dr. Bell's nurse called the police to alert them of the situation.

On April 11, 2005, plaintiff completed a subjective complaint chart. (Tr. 333). He reported experiencing pain with personal care, lifting, sitting, standing, sleeping, walking, bending, driving, work activities and home activities. Plaintiff reported his pain was slightly better. Plaintiff indicated he was experiencing the following symptoms: stress, depression, blurred vision, radiating pain, stabbing, stiffness, achey, throbbing and weakness. Plaintiff was to continue treatment. (Tr. 334).

On April 12, 2005, plaintiff underwent a mental status evaluation and evaluation of adaptive functioning performed by Dr. Scott McCarty. (Tr. 250-253). Plaintiff drove himself

AO72A
(Rev. 8/82)

to the evaluation site and was dressed appropriately and exhibited good grooming and hygiene. Plaintiff made good eye contact and was calm and cooperative yet anxiously friendly.  Dr. McCarty noted there were no pain indications.  Plaintiff reported back and leg pain and heart issues.  Plaintiff described his anxiety attacks as occurring among crowds of people with symptoms of profuse sweating, an inability or no motivation to do anything, an overwhelming need to flee and just be with his girlfriend and feeling closed in. Plaintiff reported his anxiety began in 2000, when he reduced his marijuana use from 10-20 joints per day to just one per month. Plaintiff admitted to drinking alcohol of one to two drinks daily and "binging" every two weeks. Plaintiff reported his symptoms affected his ability to work because he experienced concentration difficulties when anxious coupled with forgetfulness for routine things.  Plaintiff reported his back and leg pain prevented him from doing heavy lifting.  Plaintiff reported no inpatient or outpatient counseling other than medication management with his primary care physician.  Plaintiff reported he did not seek outpatient counseling because he was scared of what diagnosis he would receive because his grandmother had been diagnosed with schizophrenia and because he had  been able to "counsel" himself through his troubles with the recent help of his girlfriend. Dr. McCarty questioned whether plaintiff was dependent on Xanax to medicate his symptoms.  Plaintiff also appeared to use alcohol and marijuana for symptom relief.  Plaintiff reported he was in his junior year of college working towards a social work degree.

Upon observation, Dr. McCarty noted plaintiff was calm, cooperative and friendly. Plaintiff's stream of mental activity was organized and spontaneous.  Plaintiff denied hallucinations, obsessions, delusions, and unusual powers; however, he disclosed ruminative

AO72A
(Rev. 8/82)

worry about life issues.  Plaintiff reported he generally hid his mood with humor.  Plaintiff reported a good appetite and good sleep, the latter only when he takes two Xanax at night. Plaintiff reported positive social changes in his social relationships with the onset of his beneficial and close relationship with his girlfriend.  Plaintiff described his energy level as low. Plaintiff reported interests of low-impact cycling, watching television, riding his jeep on nice days and helping others.  Plaintiff described his self-concept as disappointed.  Plaintiff's estimated IQ was eighty or greater.  Dr. McCarty diagnosed plaintiff with Axis I: panic disorder without agoraphobia, alcohol abuse, cannabis dependence, polysubstance dependence in sustained full remission, rule out generalized anxiety disorder vs. substance-induced mood disorder, rule out Xanax dependence; Axis II: Cluster B traits; and Axis III: deferred to a physician. Dr. McCarty opined plaintiff's emotional condition was not expected to improve within the next twelve months without cessation of all substance use and initiation of outpatient counseling.  Dr. McCarty noted plaintiff did not appear motivated for treatment due to the ready availability of substances to numb his symptoms.

As for plaintiff's adaptive functioning, Dr. McCarty noted plaintiff could be understood and could communicate effectively.  Plaintiff described his ability to get along with others as very well. Plaintiff reported estranged and poor familial relationships, "very well" occupational relationships and "wonderful" academic relationships.  Plaintiff reported he experienced anxiety attacks in crowds greater than ten except for his classroom which he indicated he could manage. There was no evidence of unusual passivity, dependency, aggression or impulsiveness but there was some evidence of withdrawal.  Plaintiff denied problems with activities of daily living.  Dr. McCarty noted plaintiff cooperated with most medical advice but admitted to a history of

-9-

medication noncompliance.  In terms of dangerous behaviors, plaintiff abused alcohol in binge episodes evert two weeks and drank one to two drinks daily.  Plaintiff also continued to use marijuana once monthly despite his past heavy dependence of 10-20 joints daily.  Dr. McCarty questioned whether plaintiff was dependent on Xanax.  Plaintiff reported he was able to drive, make change and perform household chores without help or supervision.  Plaintiff reported he was unable to use a checkbook because he had trouble keeping it balanced.  Dr. McCarty did not observe any physical limitations and plaintiff exhibited good concentration, persistence and pace.  Dr. McCarty opined plaintiff was open and forthcoming and he saw no evidence of exaggeration or malingering.

On April 13, 2005, Dr. Brad Williams completed a Psychological Review Technique Form (PRTF), indicating that plaintiff had mild restrictions of his activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration persistence or pace; and no repeated episodes of decompensation, each of extended duration. (Tr. 254-267). Dr. Williams also completed a mental RFC assessment stating that plaintiff has moderate limitations in the following areas: in his ability to understand and remember detailed instructions; in his ability to carry out detailed instructions; in his ability to maintain attention and concentration for extended periods; in his ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; in his ability to accept instructions and respond appropriately to criticism from supervisors; and in his ability to set realistic goals or make plans independently of others. (Tr. 268-271).  Dr. Williams opined that plaintiff is "able to perform work where interpersonal contact is incidental to work

-10-

performed, e.g., assembly work; complexity of tasks is learned and performed by rote, few variables, little judgement: supervision required is simple, direct and concrete." (Tr. 270).

On May 12, 2005, plaintiff completed a subjective complaint chart.  (Tr. 335). He reported experiencing pain with personal care, lifting, sitting, standing, sleeping, walking, bending, driving and home activities. Plaintiff reported his pain was slightly worse.  Plaintiff indicated he was experiencing the following symptoms: radiating pain, stabbing, stiffness, achey, muscle spasm and throbbing.  Dr. Quint noted plaintiff reported about ten days ago he bent down to pick up groceries and his back went into spasm.  Plaintiff reported he has been sore since. (Tr. 337).  Dr. Quint noted plaintiff was working out to strengthen lower back.

Progress notes dated May 13, 2005, report plaintiff was in for a general follow-up for his diabetes, valvular disease and anxiety disorder.  (Tr. 224).  Dr. Bell noted plaintiff was intoxicated at his last visit but plaintiff reported he did not have a drinking problem.  Dr. Bell noted plaintiff was taking Xanax up to five times a day and reported he still had sleep disturbance.  Dr. Bell opined this was suspicious of bipolar disease in a manic stage.  Plaintiff also reported being depressed. Upon observation, Dr. Bell noted plaintiff looked very good, was obviously lucid and was making A's in his two college courses.  Dr. Bell diagnosed plaintiff with marked anxiety disorder with insomnia in a pressured, hyper individual with drug problems; an atypical bipolar disease without frank psychosis; and valvular heart disease with replacement doing well.  Dr. Bell wanted plaintiff on Seroquel and noted plaintiff refused to cut back on the Xanax.  Plaintiff also reported he was going to get into counseling and agreed not to consume alcohol.  Dr. Bell encouraged plaintiff to get back into exercising.

-11-

Progress notes dated July 26, 2005, report plaintiff's complaints of swollen, painful ankles when he first arises that improves over the ensuing hour or two. (Tr. 410).  Dr. Bell noted this was not associated with any edema. Upon examination, Dr. Bell noted moderate synovitis and tenderness to both ankles with motion.  There was no particular edema and plaintiff's hands and other joints were spared.  Dr. Bell diagnosed plaintiff with inflammatory degenerative osteoarthritis and prescribed Celebrex for one month.  Dr. Bell noted if this problem became chronic a more elaborate arthritis profile would be done.  Dr. Bell also noted plaintiff's mild atypical bipolar disease that was improved with Seroquel.  Plaintiff reported he was on a much more level keel but the Seroquel gave him a dry mouth.  Dr. Bell noted plaintiff was sleeping better at night and that he had not reduced his Xanax.  Dr. Bell decreased the Seroquel dosage and challenged plaintiff to reduce his Xanax.  Plaintiff was encouraged not to drink.  Dr. Bell also reduced plaintiff's Coumadin dosage.

On July 26, 2005, plaintiff completed a subjective complaint chart.  (Tr. 338). He reported experiencing pain with lifting, sitting, standing, sleeping, walking, bending, driving, work activities and home activities. Plaintiff reported his pain was slightly worse.  Plaintiff indicated he was experiencing the following symptoms: stress, depression, blurred vision, headache, radiating pain, stabbing, stiffness, achey, numbness, throbbing and weakness. Plaintiff reported he threw a towel over his head which hurt his left shoulder and mid-back.  (Tr. 339).

On September 20, 2005, plaintiff indicated he was experiencing the following symptoms: stress, radiating pain, muscle spasm and throbbing. (Tr. 340).   Dr. Quint noted plaintiff was to continue treatment as needed.  (Tr. 341).

-12-

Progress notes dated October 27, 2005, report plaintiff was in for a follow-up of his psychiatric disturbance. (Tr. 409). Dr. Bell noted plaintiff was going through a psych evaluation at the U of A. Dr. Bell noted plaintiff's counselors and psychologists thought plaintiff had mild depression, significant anxiety and attention deficit problems and probably bipolar disease. Dr. Bell noted the Seroquel helped plaintiff significantly in how he feels and how he thinks in general. Plaintiff reported concerns of weight gain so he lowered his Seroquel dosage. Plaintiff reported he did not feel manic. Plaintiff reported he had been exercising quite a bit. Dr. Bell assessed plaintiff with probable bipolar disease with anxiety disorder, mild depression and adult ADHD but doing very well; weight gain on Seroquel; high risk of recurrent diabetes; and aortic valve prosthesis, doing well with inadequate Coumadin therapy. Dr. Bell recommended raising Coumadin, stopping Seroquel and starting Topamax and returning in three months. Dr. Bell noted he wanted to get plaintiff off of Xanax.

A report dated October 12, 2005, from the University of Arkansas Psychological Clinic indicates plaintiff underwent a psychological evaluation starting on September 14, 2005, and ending October 5, 2005. (Tr. 287-294). Plaintiff underwent four sessions with clinician Lisa. S. Elwood, M.A. Ms. Elwood was supervised by Nathan L. Williams, Ph.D. Ms. Elwood noted plaintiff was referred by his therapist for an Attention Deficit Hyperactivity (ADHD) assessment. Plaintiff reported difficulties with memory, restlessness, distractibility, concentration, reading and writing. Plaintiff reported experiencing both anxious and depressive symptoms. Plaintiff reported his attention difficulties interfered with both personal and academic activities. Plaintiff reported his difficulties began around the time he started using drugs around the seventh grade. Plaintiff reported he had attended the University of Arkansas

-13-

since the Spring of 2004, and currently maintained a 3.3 grade point average.  (Tr. 289).

Plaintiff reported several health problems including deep vein thrombosis as a young adult and

open heart surgery in 2003.  Additionally, plaintiff reported he suffered from arthritis, acid

reflux, diabetes and leg and back pain.  Plaintiff reported he began therapy in the summer of

2005 with Dr. Chalungsooth at the University Counseling Center.  Treatment with Dr.

Chalungsooth primarily adhered to a harm-reduction approach to substance use.  Plaintiff

reported he consumed alcohol daily and used marijuana two or three times per week.

    After reviewing test results, Ms. Elwood diagnosed plaintiff with Axis I: generalized

anxiety disorder, dysthymic disorder, polysubstance dependence, provisional ADHD NOS; Axis

II: deferred; Axis III: deep vein thrombosis, arthritis, diabetes mellitus type II/non-insulin

dependent, acid reflux; Axis IV: sexual abuse as child; AXIS V: Current GAF 60, highest past

year 50-60.  (Tr. 293).  It was recommended that plaintiff continue to participate in individual

therapy with Dr. Chalungsooth.  Ms. Elwood opined plaintiff might benefit from cognitive-

behavioral treatment for anxiety and depression.  Ms. Elwood opined it was essential that

plaintiff's anxiety, depression, and substance problems be addressed before his attention

symptoms could be fully understood.  Ms. Elwood opined plaintiff is likely to learn better from

written information than verbal information.  Plaintiff also may benefit from the aid of a note

taker or by requesting copies of notes from classmates.  Plaintiff also may benefit from

additional time when taking tests.

    Progress notes dated December 28, 2005, report plaintiff tapered off Seroquel and got

on Topamax and had done poorly.  (Tr. 408).  Plaintiff reported he did not function well and was

having ED. Plaintiff reported sleep was also a problem.  Dr. Bell noted plaintiff brought the

psych evaluation from the university which concluded plaintiff had a generalized anxiety disorder with dysthymia and ADHD.   Upon examination, Dr. Bell noted plaintiff's aches and pains, tendinitis of the right shoulder and possible intermittent neuralgia of the left foot.  Dr. Bell noted plaintiff seemed flat, down, discouraged and more disheveled.  Dr. Bell diagnosed plaintiff with depression and bipolar disease vs. generalized anxiety disorder.  Plaintiff was started back on Seroquel.   Dr. Bell recommended plaintiff get off alcohol or any other recreational substances.

On January 3, 2006, plaintiff reported lower back pain for the past two days.  (Tr. 342). Dr. Quint also noted plaintiff had some left shoulder issues.

Progress notes dated January 31, 2006, report plaintiff is on Seroquel and is better.  (Tr. 407).  Plaintiff reported he is more calm and sleeping better.  Plaintiff reported he was taking Xanax five times a day and was still having panic attacks.  Plaintiff was drinking less alcohol. Dr. Bell noted plaintiff was not taking a lot of pain medicines.  Plaintiff complained bitterly of right shoulder pain.  Dr. Bell diagnosed plaintiff with rotator cuff tendinitis and mild bipolar disease with panic disorder, improved.  Dr. Bell injected plaintiff's shoulder with Depo-Medrol and recommended ice and motion.  Dr. Bell recommended plaintiff decrease his Xanax intake.

On January 31, 2006, plaintiff completed a subjective complaint chart.  (Tr. 343). He reported experiencing pain with personal care, lifting, sitting, standing, sleeping, walking, bending, driving and home activities. Plaintiff indicated he was experiencing the following symptoms: stress, depression, headache, radiating pain, stabbing, stiffness, achey, muscle spasm, numbness, throbbing and weakness.  Dr. Quint noted plaintiff received a cortizone shot in his shoulder.  (Tr. 344).

-15-

On March 1, 2006, plaintiff reported neck, mid-back and low back pain. (Tr. 345). Dr. Quint noted plaintiff was to continue treatment as needed.

On March 20, 2006, plaintiff completed a subjective complaint chart. (Tr. 346). He reported experiencing pain with personal care, lifting, sitting, standing, sleeping, driving, work activities and home activities. Plaintiff reported his pain was slightly better. Plaintiff indicated he was experiencing the following symptoms: stress, radiating pain, stabbing, stiffness, achey, muscle spasm and throbbing. Dr. Quint noted plaintiff experienced and exacerbation when he was unloading dishes. (Tr. 347). Plaintiff was to continue treatment as needed.

After reporting he hit a wall, on April 10, 2006, plaintiff underwent an x-ray of the right hand that revealed a fracture of the distal 5th metacarpal. (Tr. 437). An x-ray of plaintiff's left hand was normal.

Progress notes dated April 11, 2006, report plaintiff slammed his right and left fists in a wall the previous night. (Tr. 405). Plaintiff presented with bilateral hand pain, right greater than left. Dr. Michael Murphy noted x-rays revealed a minimally displaced distal Boxer's fracture of the right hand. A gutter splint was applied and plaintiff was instructed to return in a week. Plaintiff was given a prescription for 40 Percocet pills for severe pain.

On April 11, 2006, plaintiff completed a subjective complaint chart. (Tr. 348). He reported experiencing pain with personal care, lifting, sitting, standing, sleeping, walking, bending, driving, work activities and home activities. Dr. Quint noted plaintiff underwent adjustments and was to continue treatment in one week. (Tr. 349).

On April 13, 2006, plaintiff reported low back and hip and leg pain. (Tr. 351). Dr. Quint noted plaintiff underwent adjustments and was to continue treatment in four days.

-16-

On April 16, 2006, plaintiff entered the Eureka Springs Hospital emergency room complaining of pain and swelling in the right groin and thigh.  (Tr. 296).  Plaintiff reported he ran into a table six days ago.  Treatment notes indicate plaintiff had seen Dr. Bell for this as well as a fracture in his hand and had been given 40 Percocet but had run out of the medication. Plaintiff's right thigh was bruised, warm and swollen. Plaintiff denied nausea, vomiting or shortness of breath.  The examiner noted plaintiff was tender to palpation of the thigh.  Plaintiff had normal range of motion and strong pulses.  An x-ray of the right femur revealed osteoarthritis, no acute bony pathology and  suggested a scrotal hernia. (Tr. 299).  An x-ray of the right knee revealed mild osteoarthritis.  Plaintiff was sent to Berryville emergency room for a venous ultrasound.  Plaintiff was to follow-up with Dr. Kresse in three to five days.  Plaintiff was given 20 Percocet for pain.

Plaintiff underwent the venous doppler ultrasound on April 16th.  (Tr. 361-363, 438). The ultrasound revealed flow, compressibility and augmentation.  No venous clot was seen.

Progress notes dated April 18, 2006, report plaintiff was in for a follow-up of his boxer fracture of his right 5th metacarpal. (Tr. 404).  Dr. Murphy noted plaintiff continued to use the gutter splint and to take pain medication.  Repeat x-rays revealed no change in the fracture and no increase in the angulation of the injury.  (Tr. 436). Dr. Murphy recommended keeping plaintiff in the gutter splint for another three to four weeks and to use warm packs on his leg while keeping it elevated. Dr. Murphy wrote plaintiff a prescription for Percocet with the understanding that plaintiff was to use it sparingly.

On April 18, 2006, plaintiff completed a subjective complaint chart.  (Tr. 352). He reported experiencing pain with personal care, lifting, sitting, standing, sleeping, walking,

AO72A
(Rev. 8/82)

bending, driving home activities. Plaintiff reported his pain was slightly worse.  Plaintiff indicated he was experiencing the following symptoms: stress, depression, dizziness, blurred vision, radiating pain, stabbing, stiffness, achey, numbness, throbbing and weakness.  Dr. Quint noted plaintiff underwent adjustments and was to continue treatment in one week. (Tr. 353).

On April 27, 2006, plaintiff completed a subjective complaint chart.  (Tr. 354). He reported experiencing pain with personal care, lifting, sitting, standing, sleeping, walking, bending, driving, work activities and home activities. Plaintiff reported his pain was slightly worse.  Plaintiff indicated he was experiencing the following symptoms: stress, vomiting, dizziness, headache, stabbing, stiffness, achey, muscle spasm, numbness, throbbing and weakness.  Dr. Quint noted plaintiff underwent adjustments.  (Tr. 355).

On May 4, 2006, plaintiff completed a subjective complaint chart.  (Tr. 356).  He reported experiencing pain with personal care, lifting, sitting, standing, sleeping, walking, bending, driving, work activities and home activities.  Plaintiff reported his pain was about the same.  Dr. Quint noted plaintiff underwent adjustments and was to continue in one week for treatment.  (Tr. 357).

Progress notes dated May 11, 2006, report plaintiff was in for a follow-up of his right hand.  (Tr. 401).  Plaintiff reported he had to take the splint off the previous day so that he could take finals.  Dr. Murphy noted he compared both hands and their range of motion.  An x-ray of plaintiff's right hand revealed plaintiff's fifth metacarpal showed good healing with callous formation.  (Tr. 435).  Dr. Murphy told plaintiff he could come out of the splint but cautioned plaintiff against falls and hitting anything else.

-18-

On May 11, 2006 plaintiff completed a subjective complaint chart.  (Tr. 358). He reported experiencing pain with personal care, lifting, sitting, standing, sleeping, walking, bending, driving, work activities and home activities. Plaintiff reported his pain was about the same.  Plaintiff indicated he was experiencing the following symptoms: stress, radiating pain, stabbing, stiffness, achey, numbness and weakness.  Dr. Quint noted plaintiff underwent adjustments and was to continue in one week for treatment.  (Tr. 359).

Progress notes dated June 8, 2006, report plaintiff's complaints of right shoulder pain. (Tr. 400).  Dr. Murphy noted plaintiff had frequent tendinitis in the right shoulder and was questioning an injection. After examining plaintiff, Dr. Murphy administered a trigger point injection using an anterior approach.  Plaintiff was instructed to go home and apply warm compresses.

Progress notes dated June 28, 2006, report plaintiff smashed his elbow down on a coffee table over the weekend.  (Tr. 399, 376).  Dr. Murphy noted plaintiff was seen in the emergency room and x-rays revealed the possibility of a glass fragment in the soft tissues.  (Tr. 434).  Dr. Murphy noted over the past four days the redness, tenderness and soft tissue swelling had extended down to about the left wrist and extended distally up to the left biceps. Upon examination, Dr. Murphy noted plaintiff's left olecranon/epicondyle was puffy and tender.  Dr. Murphy noted erythema and warmth to touch of the left arm extending from the left biceps to the left forearm.  Range of motion was normal.  Plaintiff was diagnosed with olecranon bursitis/cellulitis. Plaintiff was given an injection of Reocephin.

-19-

On June 29, 2006, plaintiff reported his swelling and the infection were worse and requested to see someone. (Tr. 374, 398). Plaintiff was seen by Dr. Nicholas Gyles. (Tr. 372). Plaintiff's infection site was cleaned and he was prescribed medication.

On July 3, 2006, plaintiff complained of an increase in pain and that he was out of medication. (Tr. 397). Treatment notes indicate swelling in plaintiff's left elbow. Plaintiff was diagnosed with left septic olecranon bursitis. Plaintiff's elbow was re-wrapped and his pain medication was refilled.

Progress notes dated July 5, 2006, report plaintiff's complaints of thick syrupy urine. (Tr. 395). Plaintiff reported he passed three small clots earlier in the morning. Plaintiff reported having difficulty starting stream and pain in his lower abdomen that radiates around to the left lower back. Plaintiff denied any other symptoms. A KUB showed no evidence of bowel obstruction or calculi overlying the renal shadows or ureteral pathways. (Tr. 432). Plaintiff was diagnosed with hematuria, anticoagulant therapy over therapeutic, and a possible low grade urinary tract infection. Plaintiff was instructed to rest, do light activity and warned to avoid any injury.

On July 6, 2006, plaintiff reported his appetite was okay and that he had minimal pain. (Tr. 371). The site was irrigated with saline and wrapped.

Progress notes dated July 12, 2006, report plaintiff was in for a follow-up of his olecranon bursitis and for his protime found to be overtherapeutic on his last visit. (Tr. 394, 442). Dr. Murphy noted plaintiff had hematuria at that time but had not had a recurrence. Upon examination, Dr. Murphy noted plaintiff's left arm looked much better and the erythema had receded 80-85%. Plaintiff remained a little red and swollen directly over the olecranon where

there was an open wound.  Plaintiff had good range of motion and skin temperature.  Plaintiff

was diagnosed with olecranon sepsis improved and hematuria secondary to over therapeutic

range of Coumadin resolved.  Plaintiff was kept on antibiotics as a precaution.

Progress notes dated August 17, 2006, report plaintiff was at Silver Dollar City the

previous day walking around in sandals.  (Tr. 441).  Towards the end of the day, plaintiff

reported the side of his right foot began hurting.  Plaintiff denied injury or trauma.  Plaintiff

reported his left olecranon was starting to fire up again.  Upon examination, Dr. Murphy noted

plaintiff had tenderness palpating his right dorsal 5th metatarsal.   There were no external signs

of trauma and plaintiff had good pedal pulses.   X-rays of plaintiff's foot showed some

interarticular arthritic changes with no clearly observable fracture or dislocation. (Tr. 447-448).

Plaintiff was diagnosed with right foot pain with  a suspected arthritic component and chronic

left olecranitis.  Plaintiff was also a little anticoagulated.  Plaintiff was instructed to stick with

Tylenol and was given a Depo-Medrol injection

### III.    **Applicable Law:**

This court's role is to determine whether the Commissioner's findings are supported by

substantial evidence on the record as a whole.  *Ramirez v. Barnhart*, 292 F.3d 576, 583 (8th Cir.

2002).  Substantial evidence is less than a preponderance but it is enough that a reasonable mind

would find it adequate to support the Commissioner's decision.  The ALJ's decision must be

affirmed if the record contains substantial evidence to support it.  *Edwards v. Barnhart*, 314 F.3d

964, 966 (8th Cir. 2003).  As long as there is substantial evidence in the record that supports the

Commissioner's decision, the court may not reverse it simply because substantial evidence exists

in the record that would have supported a contrary outcome, or because the court would have

-21-

decided the case differently. *Haley v. Massanari*, 258 F.3d 742, 747 (8th Cir. 2001).  In other words, if after reviewing the record it is possible to draw two inconsistent positions from the evidence and one of those positions represents the findings of the ALJ, the decision of the ALJ must be affirmed. *Young v. Apfel*, 221 F.3d 1065, 1068 (8th Cir. 2000).

It is well-established that a claimant for Social Security disability benefits has the burden of proving his disability by establishing a physical or mental disability that has lasted at least one year and that prevents him from engaging in any substantial gainful activity. *Pearsall v. Massanari*, 274 F.3d 1211, 1217 (8th Cir.2001); *see also* 42 U.S.C. § § 423(d)(1)(A), 1382c(a)(3)(A).  The Act defines "physical or mental impairment" as "an impairment that results from anatomical, physiological, or psychological abnormalities which are demonstrable by medically acceptable clinical and laboratory diagnostic techniques."  42 U.S.C. § § 423(d)(3), 1382(3)(c).  A plaintiff must show that his disability, not simply his impairment, has lasted for at least twelve consecutive months.

A.      **The Evaluation Process**:

The Commissioner's regulations require him to apply a five-step sequential evaluation process to each claim for disability benefits:  (1) whether the claimant has engaged in substantial gainful activity since filing his claim; (2) whether the claimant has a severe physical and/or mental impairment or combination of impairments; (3) whether the impairment(s) meet or equal an impairment in the listings; (4) whether the impairment(s) prevent the claimant from doing past relevant work; and, (5) whether the claimant is able to perform other work in the national economy given his age, education, and experience. *See* 20 C.F.R. §§ 404.1520, 416.920.  Only if the final stage is reached does the fact finder consider the plaintiff's age, education, and work

-22-

experience in light of his residual functional capacity.  *See McCoy v. Schweiker*, 683 F.2d 1138, 1141-42 (8th Cir. 1982); 20 C .F.R. §§ 404.1520, 416.920.

IV.   **Discussion:**

Plaintiff contends that the ALJ erred in concluding that the plaintiff was not disabled since January 14, 2005, his alleged onset date through the date of the ALJ's decision.  Defendant contends the record supports the ALJ determination that plaintiff was not disabled through the date of the ALJ decision.

A.    **Plaintiff's alleged meeting of Listing 12.04:**

Plaintiff's contends the ALJ improperly found that he did not meet Listing 12.04. 20 C.F.R. Pt. 404, Subpt. P, App. 1, Listing 12.04.[1] Defendant contends there is substantial

---

[1] 12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.

The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
A. Medically documented persistence, either continuous or intermittent, of one of the following:

1. Depressive syndrome characterized by at least four of the following:

a. Anhedonia or pervasive loss of interest in almost all activities; or

b. Appetite disturbance with change in weight; or

c. Sleep disturbance; or

d. Psychomotor agitation or retardation; or

e. Decreased energy; or

f. Feelings of guilt or worthlessness; or

g. Difficulty concentrating or thinking; or

h. Thoughts of suicide; or

I. Hallucinations, delusions or paranoid thinking; or

2. Manic syndrome characterized by at least three of the following:

a. Hyperactivity; or

b. Pressure of speech; or

c. Flight of ideas; or

d. Inflated self-esteem; or

e. Decreased need for sleep; or

f. Easy distractibility; or

g. Involvement in activities that have a high probability of painful consequences which are not recognized; or

-23-

AO72A
(Rev. 8/82)

evidence in the record to support the ALJ's determination that plaintiff does not meet Listing 12.04.

The burden of proof is on the plaintiff to establish that his impairment meets or equals a listing. *See Sullivan v. Zebley,* 493 U.S. 521, 530-31, 110 S.Ct. 885, 107 L.Ed.2d 967 (1990). To meet a listing, an impairment must meet all of the listing's specified criteria. *Id.* at 530, 110 S.Ct. 885 ("An impairment that manifests only some of these criteria, no matter how severely, does not qualify."); *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004). "Medical equivalence must be based on medical findings." 20 C.F.R. § 416.926(b) (2003); *Sullivan,* 493 U.S. at 531, 110 S.Ct. 885 ("a claimant ... must present medical findings equal in severity to *all* the criteria for the one most similar listed impairment"). A review of the ALJ's decision reveals the ALJ explicitly addressed Listing 12.04 and determined plaintiff did not meet the specified criteria. While the medical evidence might establish plaintiff meets 12.04(A)(3), the evidence

---

h. Hallucinations, delusions or paranoid thinking;

Or

3. Bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes);
And

B. Resulting in at least two of the following:

1. Marked restriction of activities of daily living; or

2. Marked difficulties in maintaining social functioning; or

3. Marked difficulties in maintaining concentration, persistence, or pace; or

4. Repeated episodes of decompensation, each of extended duration;

Or

C. Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:

1. Repeated episodes of decompensation, each of extended duration; or

2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in theanytim environment would be predicted to cause the individual to decompensate; or

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

AO72A
(Rev. 8/82)

of record clearly provides substantial evidence to support the ALJ's determination that plaintiff does not have marked restrictions of activities of daily living, maintaining social functioning or maintaining concentration, persistence or pace as required in 12.04(B) and that plaintiff does not meet the criteria set forth in 12.04(C). The record reflects plaintiff reported no limitations in his activities of daily living to Dr. McCarty. Plaintiff reported very good occupational relationships and wonderful academic relationships. Plaintiff also reported a close and beneficial relationship with his girlfriend. Further, plaintiff reported he was studying to become a social worker so that he could help children. The record reflects plaintiff was able to go to local performances, the movies and amusement parks. The record shows plaintiff has maintained a good grade point average at the university. Finally, in 2005, Dr. McCarty noted plaintiff exhibited good concentration, persistence and pace. Based on the above we find substantial evidence to support the ALJ's determination that plaintiff does not meet Listing 12.04.

**B.**     **Subjective Complaints and Credibility Analysis:**

In disability determinations, credibility assessments are the province of the ALJ. *Onstead v. Sullivan*, 962 F.2d 803, 805 (8th Cir. 1992). This court will not substitute its judgment for that of the trier of fact, *Brown v. Chater*, 87 F.3d 963, 966 (8th Cir. 1996), nor will we disturb the decision of any ALJ who seriously considers, but for good reason explicitly discredits, a claimant's testimony of disabling pain. *Reed v. Sullivan*, 988 F.2d 812, 815 (8th Cir. 1993). While an ALJ may not discount a claimant's subjective complaints solely because the medical evidence fails to support them, an ALJ may discount those complaints where inconsistencies appear in the record as a whole. *Id*. As the United States Court of Appeals for the Eighth Circuit observed, "Our touchstone is that [a claimant's] credibility is primarily a

-25-

matter for the ALJ to decide." *Edwards v. Barnhart,* 314 F.3d 964, 966 (8th Cir. 2003). We believe the ALJ adequately evaluated the factors set forth in *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984), and conclude there is substantial evidence supporting the ALJ's determination that plaintiff's complaints were not fully credible.

The medical evidence of record reveals plaintiff has sought consistent treatment for DVT through Coumadin therapy. While the record shows plaintiff at times was over-therapeutic the medical evidence reveals plaintiff has been able to manage his DVT through physician examinations and medication management. Plaintiff has also sought treatment for pain in his back, legs, ankles and shoulder. The record reveals plaintiff has also been able to manage these impairments with medication and exercise. Plaintiff did undergo a heart valve replacement but the medical evidence fails to show any on-going impairments with his heart. Plaintiff clearly has physical impairments, however the record shows plaintiff has been able to maintain a fairly active lifestyle despite these diagnoses.

While plaintiff alleges disabling depression, ADHD, anxiety and bipolar disorder, the evidence of record reveals plaintiff's impairments have been successfully managed with medication. *See Hutton v. Apfel*, 175 F.3d 651, 655 (8th cir. 1999) (impairments amenable to treatment not disabling). The record further reflects that with some aid through university services plaintiff has maintained a 3.7 grade point average and planned to obtain a master's degree in social work. Plaintiff reported that crowds of more than ten bothered him but he was able to manage going to classes with people. Plaintiff reported he was also able to attend local performances when they were available, to go to the movies three to four times per year and to spend a day at a popular amusement park. Plaintiff reported poor familial relationships but very

-26-

good relationships with his girl friend and co-workers and wonderful academic relationships. While the record clearly shows plaintiff does have mental impairments, the evidence as a whole supports the ALJ's determination that these impairments are not disabling.

Plaintiff's subjective complaints are also inconsistent with evidence regarding his daily activities. At the administrative hearing in September of 2006, plaintiff reported he was taking ten credit hours at the university.  Plaintiff reported he drove himself to classes that he attended school five days a week. *See Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006) (ALJ properly considered that claimant had attended college classes during the relevant period of time).  The record further shows plaintiff denied any limitations in activities of daily living and was even able to spend the day at an amusement park in August of 2006.  *See Tindell v. Barnhart*, 444 F.3d 1002, 1005 (8th Cir. 2006) (ALJ properly considered that claimant had attended college classes during the relevant period of time)*; See Hutton v. Apfel*, 175 F.3d 651, 654-655 (8th Cir. 1999) (holding ALJ's rejection of claimant's application supported by substantial evidence where daily activities– making breakfast, washing dishes and clothes, visiting friends, watching television and driving-were inconsistent with claim of total disability).

Therefore, although it is clear that plaintiff has some limitations, he has not established that he is unable to engage in any gainful activity.  *See Craig v. Apfel*, 212 F.3d 433, 436 (8th Cir. 2000) (holding that mere fact that working may cause pain or discomfort does not mandate a finding of disability); *Woolf v. Shalala*, 3 F.3d 1210, 1213 (8th Cir. 1993) (holding that, although plaintiff did have degenerative disease of the lumbar spine, the evidence did not support a finding of disabled).  Neither the medical evidence nor the reports concerning his daily activities support plaintiff's contention of total disability.  Accordingly, we conclude that

-27-

substantial evidence supports the ALJ's conclusion that plaintiff's subjective complaints were
not totally credible.

    **C.**    **RFC Assessment:**

We next turn to the ALJ's assessment of plaintiff's RFC.  RFC is the most a person can do
despite that person's limitations.  20 C.F.R. § 404.1545(a)(1).  It is assessed using all relevant
evidence in the record. *Id*.  This includes medical records, observations of treating physicians and
others, and the claimant's own descriptions of his limitations. *Guilliams v. Barnhart*, 393 F.3d 798,
801 (8th Cir. 2005); *Eichelberger v. Barnhart*, 390 F.3d 584, 591 (8th Cir. 2004).  Limitations
resulting from symptoms such as pain are also factored into the assessment.  20 C.F.R. §
404.1545(a)(3).  The United States Court of Appeals for the Eighth Circuit has held that a
"claimant's residual functional capacity is a medical question." *Lauer v. Apfel,* 245 F.3d 700, 704
(8th Cir. 2001).  Therefore, an ALJ's determination concerning a claimant's RFC must be supported
by medical evidence that addresses the claimant's ability to function in the workplace." *Lewis v.
Barnhart,* 353 F.3d 642, 646 (8th Cir. 2003).  "[T]he ALJ is [also] required to set forth specifically
a claimant's limitations and to determine how those limitations affect his RFC." *Id.*

In the present case, the ALJ considered the medical assessments of examining agency
medical consultants, plaintiff's subjective complaints, and his medical records.  Plaintiff's
capacity to perform this level of work is supported by the fact that plaintiff's treating and
examining physicians placed no restrictions on his activities that would preclude performing the
RFC determined. *See Hutton v. Apfel*, 175 F.3d 651, 655 (8th Cir. 1999) (lack of physician-
imposed restrictions militates against a finding of total disability).  Based on the record indicating
plaintiff was able to successfully attend a university, evidence indicating plaintiff could do

-28-

normal activities of daily living and the medical evidence, we find substantial evidence to support the ALJ's RFC determination.

>    **D.**    **Hypothetical Proposed to Vocational Expert:**

After thoroughly reviewing the hearing transcript along with the entire evidence of record, we find that the hypothetical the ALJ posed to the vocational expert fully set forth the impairments which the ALJ accepted as true and which were supported by the record as a whole. *See Goff v. Barnhart,* 421 F.3d 785, 794 (8th Cir. 2005). Accordingly, we find that the vocational expert's testimony constitutes substantial evidence supporting the ALJ's conclusion that plaintiff's impairments do not preclude him from performing his past relevant work as a host or other work as an assembler. *Pickney v. Chater*, 96 F.3d 294, 296 (8th Cir. 1996)(testimony from vocational expert based on properly phrased hypothetical question constitutes substantial evidence).

**V.**    **Conclusion:**

Based on the foregoing, we recommend affirming the ALJ's decision, and dismissing plaintiff's case with prejudice.  **The parties have ten days from receipt of our report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 7th day of August, 2009.

/s/    *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
UNITED STATES MAGISTRATE JUDGE

-29-

AO72A
(Rev. 8/82)